

1    Bail Reform Act.

2           THE COURT:  That's my practice is where -- Mr.

3    Tucker, do you agree that this is a presumption case?

4           MR. TUCKER:  I do, Your Honor.

5           THE COURT:  Then I will have the defendant go forward

6    first because it is the defendant's burden.

7           MR. TUCKER:  Do you wish us to approach the podium,

8    for him to take the stand or remain at counsel table?  Because

9    I've got some bond questions I've got to ask him.

10          THE COURT:  For the defendant, it's fine for him to

11   approach the podium.  I think that's best.

12                        DONALD S. ADAMS,

13    having been first duly sworn, was examined and testified as

14    follows:

15          THE CLERK:  Please state your full name and spell

16   your last name for the record.

17          THE DEFENDANT:  Donald Stephen Adams, A-d-a-m-s.

18                     DIRECT EXAMINATION

19   BY MR. TUCKER:

20       Q.    Mr. Adams, how old are you?

21       A.    62.

22       Q.    And your date of birth?

23       A.    10/4/56.

24       Q.    And where do you currently reside?

25       A.    Currently I've been staying at 130 Old Buddy Road.  I

1    believe it's Waynesville.

2         Q.    Would that be in Glynn County or Brantley County?

3         A.    Brantley County.

4         Q.    And who lives there with you?

5         A.    My wife and friend's of her mother.

6         Q.    And how long have you resided at that address?

7         A.    About a week.

8         Q.    And where did you reside before then?

9         A.    Salvation Army.

10        Q.    And where did you reside before then?

11        A.    I was at motels, different motels, working as a

12   maintenance man for room and board.

13        Q.    How long have you been residing inside the Southern

14   District of Georgia, which basically goes the corner of the

15   state from Augusta to Valdosta, which would include Brunswick,

16   Camden County, Ware County, how long have you been lived here?

17        A.    I first moved down here in I believe it was '93.

18        Q.    And have you been here on a continuous basis since

19   that time or have you lived in other places?

20        A.    I -- the only -- well, I've lived in -- it's been in

21   South Carolina and also in Arizona during that time for short

22   periods of time because of the job I had transferred me to

23   those states.

24        Q.    And what type of work have you done over the last ten

25   years?

10

1      A.    The last ten years, I've done retail, construction,

2    maintenance.   Now I'm doing work over at -- I've been doing

3    work over at the port as far as driving and QCM.

4      Q.    Do you have a TWIC card?

5      A.    Yes, sir, I do.

6      Q.    And what type of work -- are you actually driving at

7    the port or offloading trucks and vehicles at IAP or are you --

8      A.    No.

9      Q.    -- driving trucks that are hauling materials to take

10   off the port site?

11     A.    No, I'm not driving -- I'm just driving cars from

12   Point A to Point B on the port.

13     Q.    And how long have you been employed in that status?

14     A.    About a month.

15     Q.    Is your employer G-Star Staffing?

16     A.    Yes, it is.

17     Q.    Is that a temporary agency?

18     A.    It -- it is, but it isn't because you work full time,

19   but IAP finds it's cheaper to go that route than to hire

20   themselves, and then -- then they can pick through the people

21   to see who they want to go company.

22     Q.    Do you have any children?

23     A.    No, sir.

24     Q.    Do you have any family that resides outside the state

25   of Georgia?

1   A. I have a mother and sister that reside in Florida.

2   Q. Do you have a passport?

3   A. No, sir.

4   Q. Have you ever traveled outside the continental United

5 States for any reason?

6   A. When I was with -- young, I lived in Japan for four

7 and a half years because my dad was in the navy.

8   Q. And what was the last time you've traveled outside

9 the continental United States?

10   A. Might have gone down to Mexico a couple of times when

11 I was a teenager.

12   Q. When is the last time, 40 years ago?

13   A. Easily.

14   Q. The preservices report indicates that you have a

15 prior conviction for possession of a controlled substance for

16 sale in San Bernardino, California back in 1988.  Do you recall

17 that incident?

18   A. Yes, sir.

19   Q. Did you receive three years' probation and 240 days

20 in jail?

21   A. I believe it was something like that.

22   Q. Did you complete that probation without any problem?

23   A. Yes, sir.

24   Q. Have you been on probation anywhere else since 1988?

25   A. No, sir.

1    Q.    Have you been convicted of any crimes since 1988?

2    A.    No, sir.

3    Q.    Have you had any criminal offenses or been charged

4    with anything since 1988?

5    A.    No, sir.

6    Q.    Do you know anything about a theft by shoplifting

7    that allegedly occurred on 11/23, November 23rd, 2015?

8    A.    Yes, sir.  I know that -- I was never charged -- I

9    mean, I was arrested, but I was never charged.

10   Q.    To your knowledge, has that case not been prosecuted?

11   A.    There was nobody came down and filed from the store

12   from what I was told.

13   Q.    And also on the preservices report there's apparently

14   a 1990 arrest in San Bernardino, California for transporting

15   controlled substances.  The disposition is unknown.  Do you

16   know anything about that charge?

17   A.    No, sir, I do not.

18   Q.    Do you recall anything about it?

19   A.    No, sir, I do not.

20   Q.    Are those the only two times in your life you recall

21   that you've been arrested is when you were in San Bernardino in

22   1988 and the shoplifting charge in 2015, which has not been

23   pursued?

24   A.    Yes, sir.

25   Q.    Have you ever been involved in a violent crime

1    before?

2         A.    No, sir.

3         Q.    Do you have any reason to give The Court or should

4    The Court be concerned that if it gives you a bond that you

5    will break the law?

6         A.    No, sir.

7         Q.    Does The Court have any reason to be concerned that

8    if he were to give you a bond that you would continue to deal

9    in drugs?

10        A.    No, sir.

11        Q.    Do you have any reason to believe or does The Court

12   have any reason to have concerns that if you were released on

13   bond that you would fail to appear to court when required to do

14   so?

15        A.    No, sir.  If I was going to do that, I would have

16   done it when they first interviewed me.

17        Q.    And you weren't arrested until Monday; is that

18   correct?

19        A.    Yes.

20        Q.    And you were interviewed in September of 2018 about

21   this offense?

22        A.    Yes, sir.

23        Q.    This offense allegedly occurred back in December of

24   last year; is that correct?

25        A.    Yes.

```
1          Q.     And did you know prior to September that you were
2    being investigated?
3          A.     No, sir.
4          Q.     And did you cooperate fully with the investigators
5    when they interviewed you in September of 2018?
6          A.     Yes, sir.
7          Q.     Did you tell them everything that you knew about this
8    particular offense?
9          A.     Yes, sir.
10         Q.     Did you make admissions about your conduct?
11         A.     Yes, sir.
12         Q.     Did they tell you at that point in time that you were
13   going to be arrested and charged with this offense?
14         A.     No, sir.
15         Q.     Did you have reason to believe that you were going to
16   be arrested and charged with this offense?
17         A.     No, sir.
18         Q.     And yet you made no attempt to leave the jurisdiction
19   of the State of Georgia, did you?
20         A.     No, I did not, sir.  I tried to find a job to be
21   stable with me and my wife right here.
22         Q.     If The Court were to release you on bond, would you
23   attempt to intimidate any witness or attempt to obstruct
24   justice?
25         A.     No, sir.
```

1        Q.      Would you pose a threat or a danger to the community?

2        A.      No, sir.

3        Q.      Are you willing to a wear an ankle monitor if The

4    Court grants you a bond?

5        A.      Yes, sir.

6        Q.      And are you going to continue to have your employment

7    with G-Star Services?

8        A.      I am certainly going to try, but I was arrested on

9    the property there, so I don't know how that goes.

10       Q.      Do you have any assets, homes, anything that you

11   could use, any family member could use to put up a bond on your

12   behalf?

13       A.      Unfortunately, no, sir.

14       Q.      What is the financial condition of your parents or

15   family who live down in Florida?  Are they in a position where

16   they could come up here and help you post a bond?

17       A.      Probably not.  My mom is retired.  All she has is my

18   dad's retirement pension.  I wouldn't even ask her, you know.

19       Q.      Okay.  In addition --

20       A.      And she would refuse anyway.

21       Q.      In addition, there's been some substance abuse

22   allegations contained in the preservice report that you last

23   used alcohol approximately a week ago, last used cocaine

24   approximately four months ago, last used heroin approximately

25   eight months ago and used prescription opiates approximately

1    six months ago.  Would that be correct?

2         A.    Yes, sir.

3         Q.    If you were tested today, would you be positive for

4    any controlled substances?

5         A.    No, I do not believe so.

6         Q.    Are you asking The Court to give you a bond?

7         A.    Yes, I do.

8              MR. TUCKER:  Your Honor?

9              THE DEFENDANT:  The reason I'm asking for this bond

10   is my wife has COPD.  She cannot find a job herself because she

11   can't hardly breathe.  I need to be able to work to make some

12   money so that when this case comes to trial and that, that she

13   will be able to continue.

14             MR. GILLULY:  I would love the opportunity to cross

15   if --

16             THE COURT:  Any objections, Mr. Tucker?

17             MR. TUCKER:  Not at all.

18             MR. GILLULY:  May I either do it from here or either

19   have the witness --

20             THE COURT:  I think if the witness would come up to

21   the witness stand for any cross-examination.

22                              CROSS-EXAMINATION

23   BY MR. GILLULY:

24        Q.    Mr. Adams, were you in here when the Judge explained

25   the charges but when I went over the penalty for this offense?

1        A.    Yes, sir, I --

2        Q.    So you understand that with a prior drug conviction,

3   which you do have; correct?

4        A.    Yes, sir.

5        Q.    You realize you're looking at not less than life in

6   prison if you are convicted?

7        A.    Yes, sir.

8        Q.    And, you know, you talked to the FBI agent -- one of

9   these individuals is in the courtroom -- is that one of the

10  agents you talked to?

11       A.    Yes, sir.

12       Q.    And when you interviewed with him, he didn't tell you

13  what to say, did he?

14       A.    No, he didn't.

15       Q.    No.  In fact, he didn't put you in handcuffs.  He

16  didn't demand that you answer his questions.  You answered his

17  questions freely and voluntarily; correct?

18       A.    Yes, sir, I did.

19       Q.    Without any kind of coercion?

20       A.    Yes, sir.

21       Q.    Without any promises?

22       A.    Yes, sir.

23       Q.    And during that interview, you told him that you, you

24  know, you sold heroin --

25       A.    No, sir.

1        Q.      -- with -- okay.   It's your testimony you did not

2    admit to delivering heroin?

3        A.      I delivered, yes.   I did not sell.

4        Q.      Delivered heroin from Makeda Atkinson?

5        A.      Yes, sir.

6        Q.      And you delivered heroin that you got from Makeda

7    Atkinson.   In fact, he would give you drugs so that -- as a

8    form of kind of payment; is that right?

9        A.      More or less.

10       Q.      And you had an addiction problem or have one

11   yourself; right?

12       A.      I don't have one anymore.

13       Q.      You last used heroin about eight months ago, but you

14   were using it at least on a weekly basis; right?

15       A.      Yes.

16       Q.      And prescription opioids you last used about six

17   months ago, and you were using those on a weekly bass?

18       A.      Pretty much.

19       Q.      And you would agree that the heroin you were getting,

20   you were unlawfully getting it?

21       A.      Yes, sir.

22       Q.      And the opioids, those weren't from prescriptions?

23       A.      No, sir.

24       Q.      You were getting those illegally, too?

25       A.      Yes, sir.

1    Q.    And cocaine, about last used four months.  Obviously

2    it's illegal to possess cocaine; right?

3    A.    Yes, sir.

4    Q.    You know, one of the things that the lawyer asked you

5    about, in addition to some of the questions by the agent, was

6    where you were living.  You would agree with me that you don't

7    own a house?

8    A.    No, sir.

9    Q.    You don't have any assets?

10   A.    No, sir.

11   Q.    In fact, when the agents interviewed you, you were at

12   a homeless shelter?

13   A.    Yes, sir.

14   Q.    And you were, prior to the homeless shelter, you were

15   bouncing around from motel to motel for like four years?

16   A.    Yes, sir.

17   Q.    And not only do you or did you have an addiction

18   problem but your wife did, too?

19   A.    Yes, sir.  I basically -- for the first two and a

20   half years, we were at the same motel.

21   Q.    And then after the two and a half, before, you know,

22   while you were -- for the last four years, while you were doing

23   maintenance work at various motels in exchange for room and

24   board, some of that time your wife wasn't with you; some of the

25   time she was?

1      A.     She was pretty much with me.

2      Q.     Doing drugs with you also at times?

3      A.     Yes, sir.

4      Q.     Okay.  And in fact, it was at a hotel that you

5    sometimes would even deliver some of the drugs for Mr.

6    Atkinson?

7      A.     From -- deliver from but not to the motel.

8      Q.     But you would be at the hotel where it would be

9    dropped off?

10     A.     No.  He would be at the motel also.

11     Q.     But you would also serve people from that hotel?

12     A.     Yes.  He was -- he was busy with other things and he

13   would ask me to take this to this person.

14     Q.     Okay.  With regard to your job, it is a job that is

15   with a temporary service; right?

16     A.     Yes, sir.

17     Q.     You don't know if you're going to have that job

18   because you were arrested by law enforcement from work; right?

19     A.     Yes, sir.  Right.

20     Q.     After agents interviewed you while you were at the

21   homeless shelter, after that, you soon after moved; is that

22   right?

23     A.     No, sir.

24     Q.     When did you move?

25     A.     The Monday before I was arrested.

1      Q.    So it's just as recent as the Monday before you were

2  arrested you moved to another location?

3      A.    Yes, sir.

4      Q.    And you haven't been working consistently for even a

5  month; is that right?

6      A.    Yes, sir, I have.

7      Q.    Well, you started September 24th; right?

8      A.    Somewhere around there.

9      Q.    Okay.  And you don't know if that job will be around

10  when you get out; that's fair to say?

11      A.    Well, I'm pretty sure that if I get out on bond that

12  I can work off site.  I can't work on the port itself with an

13  open case.

14      Q.    Okay.

15      A.    But I can work off site.

16      Q.    And are you aware that law enforcement was looking

17  for you for over two weeks before they found you?

18      A.    I had no clue.

19      Q.    And they actually had to come on the port to find you

20  because you weren't at the same location you were when they

21  interviewed you the first time?

22      A.    But I had told them that I was working at the port.

23  As a matter of fact, I was on my way to work when they picked

24  me up.

25      Q.    And are you still getting help for your mental

1    condition?  Do you have -- bipolar; right?

2        A.    Well, they -- that's what I was -- but I don't seem

3    to have any problems.

4        Q.    Okay.

5        A.    I haven't taken anything in several years.

6        Q.    You last went to a counselor, I believe, was in May

7    of 2018 for stress-related issues?

8        A.    Yes, sir.  That was my wife -- my stepdaughter had

9    just been admitted to the hospital and my wife drank -- had

10   tried to commit suicide.

11            MR. GILLULY:  Okay.  That's all the questions I have,

12   Your Honor.

13                      DIRECT EXAMINATION

14   BY MR. TUCKER:

15       Q.    Mr. Adams, without going indepth conversations about

16   the acts that you're accused of, let me ask you, sir:  Did you

17   know that you were distributing fentanyl --

18       A.    No, sir, I did not.

19       Q.    -- on September 27th, 2000 -- I'm sorry.  On December

20   of 2017?

21       A.    No, sir, I did not.

22       Q.    Did you think it was heroin?

23       A.    Yes, sir.

24       Q.    Is that what you had been told it was?

25       A.    That's what I was told it was.

1    Q.    Did you ever have any intent to distribute fentanyl?

2    A.    No, sir.

3    Q.    If you had known it was fentanyl, would you have

4    taken it to anybody?

5    A.    No, sir.

6    Q.    At the time it was delivered by you, did you have any

7    suspicion, understanding or knowledge that it was anything

8    other than heroin?

9    A.    No, sir, I did not.

10         MR. TUCKER:  Thank you, sir.

11         THE COURT:  Mr. Adams, you can step down.

12         Mr. Tucker, any additional witnesses?

13         MR. TUCKER:  No, Your Honor.

14         THE COURT:  Any other argument you would like to

15   present?

16         MR. TUCKER:  No, Your Honor.

17         THE COURT:  Mr. Tucker, just a couple of questions

18   that I would like to ask.

19         MR. TUCKER:  Sure.

20         THE COURT:  I understand that -- I believe it's 130

21   Bay Road is the residence.

22         THE DEFENDANT:  Old -- Old Buddy Road.

23         THE COURT:  Old Bay.

24         THE DEFENDANT:  Old Buddy, B-u-d-d-y.

25         THE COURT:  Old Buddy.

1    THE WITNESS:  Like a buddy.

2    THE COURT:  Mr. Tucker, I understand that's only one

3    week at that residence.  Is that a rental property?

4    THE DEFENDANT:  Yes, it is a rental property.

5    THE COURT:  And is there a lease on that property?

6    THE DEFENDANT:  I believe the lady that is living

7    there and my wife's friend has a lease on it.

8    MR. TUCKER:  Are you literally living with someone

9    else who has a lease?

10   THE DEFENDANT:  Pretty much, yes, sir.  She's -- the

11   lady has had a brain tumor removed and her daughter is

12   incarcerated and her daughter has asked my wife and I to look

13   out for her while she's incarcerated.

14   MR. TUCKER:  May we inquire as to what her daughter's

15   name is?

16   THE DEFENDANT:  Chrissy Westcott.

17   THE COURT:  I'm sorry, could you say that a little

18   louder?

19   THE DEFENDANT:  Or actually I think Chrissy is

20   here -- her real name is Geneva.

21   THE COURT:  Westcott is the last name?

22   THE DEFENDANT:  Yes.  Yes, sir.

23   THE COURT:  And Geneva Westcott is the tenant at that

24   property?

25   THE DEFENDANT:  No, that's the daughter.

```
 1              THE COURT:  That's the daughter.
 2              THE DEFENDANT:  Yes, sir.
 3              MR. TUCKER:  And I asked that name, Your Honor,
 4   because we've got so many felony indictments out of Brantley
 5   County for distribution of meth and sale of meth, I can't
 6   remember if that's one of them that we've been dealing with or
 7   not, so...
 8              THE COURT:  Understood.  Has there been any
 9   communication with G-Star about employment since this arrest?
10              THE DEFENDANT:  I didn't really --
11              THE COURT:  Have you made any contact with G-Star,
12   your previous employer, about ongoing employment since this
13   arrest has been made.
14              THE DEFENDANT:  No, sir, I have not.  I don't have
15   any money on my books, so I can't make no phone calls.
16              MR. TUCKER:  Don't have any phone access.
17              THE COURT:  Mr. Gilluly, do you have any evidence or
18   argument you would like to present?
19              MR. GILLULY:  Yes, Judge, I would like to call John
20   Wood to the stand.
21              SPECIAL AGENT JONATHAN WOOD,
22    having been first duly sworn, was examined and testified as
23    follows:
24              THE CLERK:  Thank you.  You may be seated.  Please
25   state your full name, spell your last name for the record, state
```

1    your occupation and your business address.

2              THE WITNESS:  Jonathan Wood, W-o-o-d, special agent

3    with the FBI, and we work at 117 Northpark Drive here in

4    Brunswick.

5                        DIRECT EXAMINATION

6    BY MR. GILLULY:

7         Q.    Agent Wood, are you one of the investigators against

8    Donald Adams, who is present in the courtroom?

9         A.    I am.

10        Q.    And did you have any difficulty finding him after the

11   arrest warrant was issued for his arrest?

12        A.    Yes.

13        Q.    Can you tell The Court about that.

14        A.    Forget the exact date.  I believe it was two Fridays

15   ago the warrant was issued.  We have been looking consistently

16   since then, utilizing numerous techniques at our disposal, and

17   it was only recently that we were able to locate him.

18        Q.    When you interviewed him originally, he was at a

19   homeless shelter?

20        A.    Correct.

21        Q.    And then after, the next time you tried to find him,

22   obviously he was not there?

23        A.    He was not.

24        Q.    Is that correct?

25        A.    No.

1       Q.     Did you have an opportunity to talk to his wife about

2    where he was located?

3       A.     Yes.  Just a couple days ago.

4       Q.     And then that's when you learned --

5       A.     Correct.

6       Q.     -- where he was located.  Is that when you went and

7    arrested him?

8       A.     Yes.

9       Q.     And the defense lawyer went into a little bit about

10   the statement.  Let me ask you:  Did this defendant admit to

11   distributing a controlled substance in conjunction with Mr.

12   Atkinson, his defendant?

13      A.     Yes.

14      Q.     Did he admit distributing controlled substance the

15   very night before the victim of this death died?

16      A.     Yes.

17      Q.     And did he indicate to you whether or not that was

18   the only time he had ever distributed a controlled substance?

19      A.     He said that was not the only time.  He didn't say --

20   I would have to go back to our report, but that was not the

21   first time.

22      Q.     Sure.  Did he explain like how he benefited by

23   distributing drugs for Mr. Atkinson?

24      A.     Just that he would -- our understanding is that he

25   would receive payment in the form of drugs.  I don't know if

1    there was a monetary benefit as well between he and Mr.

2    Atkinson but that he would receive drugs as payment sometimes

3    for the assistance.

4         Q.    And, in fact, with regard to the overdose death, is

5    it true that this defendant is the one who physically

6    distributed the drugs to the victim --

7         A.    Correct.

8         Q.    -- who thereafter ingested it and died?

9         A.    Yes.

10        Q.    Do you know how old this woman was?

11        A.    Maybe in her thirties.

12        Q.    Did she have any children?

13        A.    Yes.

14        Q.    Do you know who found the dead woman?

15        A.    Yeah, their daughter.

16        Q.    Five-year-old daughter?

17        A.    Right.

18              MR. GILLULY:   That's all the questions I have, Your

19   Honor.

20                           CROSS-EXAMINATION

21   BY MR. TUCKER:

22        Q.    Good morning.

23        A.    Good morning.

24        Q.    Am I correct that the complaint was filed on October

25   the 12th, 2018; is that correct?

1     A.    I would have to see it, but that sounds about right.

2           MR. TUCKER:  May I approach, Your Honor?

3           THE COURT:  Sure.

4           THE WITNESS:  Yes.

5     Q.    (By Mr. Tucker)  Attached to that complaint -- I'm

6   sorry, and attached to that complaint is an affidavit that you

7   prepared, I believe; is that correct?

8     A.    Correct.

9     Q.    We've determined this morning that that affidavit has

10  some factual inaccuracies about the dates.  It says this

11  incident occurred on December 28th, 2018 but it's actually

12  December 28th, 2017.

13    A.    Correct.

14    Q.    How long have you been actively investigating this

15  particular incident?

16    A.    Since -- I want to say July, the end of July, maybe

17  the beginning of August it was brought to our attention.  We

18  had been aware of the -- the distribution, narcotics

19  distribution, by Mr. Atkinson, but we were filled in more once

20  we collaborated with CID at Glynn County as to the bigger

21  picture going on here.  Probably end of July, beginning of

22  August.

23    Q.    I believe that the victim's mother is actually the

24  one who pointed out Mr. Adams as being the one that physically

25  sold the substance to her daughter because she delivered her

1    daughter to the -- to the place where it was distributed?

2        A.    Correct, she was the driver.

3        Q.    Am I correct that you first interviewed Mr. Adams on

4    September the 27th, 2018?

5        A.    Correct.

6        Q.    Did you tell him at that point in time that he was

7    the subject of an investigation?

8        A.    I personally was not involved in his interview.  That

9    was one of the task force officer on our task force and an

10   investigator with Glynn County, criminal investigative

11   division, but, yes, he was asked to come in and answer

12   questions.

13            He was advised of his Miranda right and then said he

14   would willingly talk to law enforcement, and then we just got

15   into the story, so he was aware of the investigation.

16            We did not tell him whether or not he was under

17   arrest or was being looked at for charges.

18       Q.    Is any part of his statement that you've been at that

19   you've been able to verify that is untrue or false?

20       A.    Say that again.  Sorry.  Is there any part of his

21   statement?

22       Q.    That you have been able to verify that it is untrue

23   or false?

24       A.    No.  Out of the -- a lot of the facts that he stated,

25   we were able to corroborate.  Obviously we're not going to know

1    if he's telling -- if every detail is the truth or not, but if

2    you have something particular, I would be happy to answer that,

3    but, no, I mean, nothing that I've discovered that he's just

4    lying to us about that I know of.

5         Q.    Well, that's my question.  Do you know of anything

6    that he's lying about?

7         A.    No, not that I know, except that earlier he claimed

8    that he told us he was at the port.  We don't have any

9    knowledge of that.  That was the -- obviously, we would not

10   have looked for a week and a half or almost two weeks if we

11   knew he was at the port.

12        Q.    Let's ask that.  You knew that he was at the homeless

13   shelter?

14        A.    Correct.

15        Q.    And if the complaint was filed on the 12th?

16        A.    Uh-huh.

17        Q.    And he didn't leave the homeless shelter until the

18   17th, is there any particular reason during that six-day period

19   of time y'all couldn't find him?

20        A.    It -- I believe it was signed Friday.  We didn't

21   begin actively looking for him until Monday or Tuesday, and,

22   yes, we did go to the homeless shelter, spoke to the manager.

23            He had not reported there for -- I want to say the

24   first time he had not reported the night before, and so it was

25   just poor timing by the time we -- I mean, we went straight

32

1    there to the homeless shelter, but he had not stayed there the

2    night before.

3         Q.    Well, you don't know of any evidence that he fled

4    to Brantley County to avoid arrest, do you?

5         A.    No.

6         Q.    And he was actually arrested going to work to the

7    port?

8         A.    Coming home from work.

9         Q.    Coming home?

10        A.    Uh-huh.

11        Q.    How was it that you knew where to physically find

12   him?

13        A.    We -- we were able to contact his wife.

14        Q.    Okay.

15        A.    And we discovered that they were living in Brantley

16   County or had reason to believe that they were at a house

17   located in Brantley County.

18              His wife told us that he was working at the port, and

19   so later, either later that -- I believe it was later that day,

20   we found him at the port.

21        Q.    And when he was arrested, was it done by a

22   plainclothes officer or blue lights, traffic stop?

23        A.    No.  They just approached him on foot, plainclothes.

24        Q.    Did he make any attempt to flee?

25        A.    No.  It was the officers that had interviewed him

```
 1    previously, so he -- he knew who they were.
 2         Q.    Was he compliant?
 3         A.    Yes.
 4         Q.    Give any trouble?
 5         A.    No.
 6         Q.    Commit any acts of violence?
 7         A.    No.
 8         Q.    Cuss anybody like a dog?
 9         A.    No.
10         Q.    Anything but respectful?
11         A.    No.
12               MR. TUCKER:  That's all I have, Your Honor.
13               THE COURT:  Any redirect, Mr. Gilluly?
14               MR. GILLULY:  No, Your Honor.
15               THE COURT:  Thank you, Agent.  You can step down.
16               MR. GILLULY:  Just argument at the appropriate time.
17               THE COURT:  No further witnesses?
18               MR. GILLULY:  That is correct, Your Honor.
19               THE COURT:  Mr. Gilluly, if you would like to present
20    your argument.
21               MR. GILLULY:  Yes, please.
22               Judge, we are asking that this defendant be detained.
23    Congress, when it enacted the Bail Reform Act, took into
24    consideration certain charges, and with those charges, they
25    found them to be of such a serious nature that Congress created
```